LESTER KISSKA and VIRGINIA B. KISSKA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kisska v. Commissioner
Docket No. 2258-80.
United States Tax Court
T.C. Memo 1981-655; 1981 Tax Ct. Memo LEXIS 87; 42 T.C.M. (CCH) 1651; T.C.M. (RIA) 81655; November 10, 1981. Mitchell J. Olejko, C. James Judson, and Richard E. Cassard, for the petitioners. Jeannette A. Cyphers, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $ 4,676 in petitioners' Federal income *88 tax for 1977. The issues for decision are: 1. Whether a payment by petitioners for the release from liability on a promissory note which arose from the prior purchase of certain property constitutes a reduction of the capital gain recognized on the sale of that property, as contended by respondent, or an ordinary business expense deduction under section 162(a)[1] or business loss under section 165(a), as contended by petitioners. 2. Whether all or part of certain legal fees constitute an expense of selling the property or an ordinary business expense. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. Petitioners Lester Kisska (hereinafter petitioner) and Virginia B. Kisska, husband and wife during the pertinent period, were legal residents of Ferndale, Washington, when they filed their petition. They timely filed their joint Federal income tax return for 1977 with the Internal Revenue Service Center, Ogden, Utah. In 1973, petitioners purchased an apartment building in Seattle, Washington, from Michael R. Mastro (Mastro) and Joan *89 K. Mastro [2] and Isaac S. and Nancy Gamel and as part of the consideration gave a promissory note secured by a deed of trust. The principal amount of the promissory note was $ 430,000. The building was used by petitioner for rental purposes. At the time of the purchase, petitioner was involved in various other businesses. Diversified Investors, Limited, which managed the apartment building, collected all of the rents and made all of the required payments under the promissory note and deed of trust. Approximately 1-1/2 to 2 years after the purchase of the building, petitioner was notified by Mastro that he was late in the mortgage payments. Petitioner terminated the management contract with Diversified Investors, Limited, and hired a second management company. This company quit after 4 months, declaring the building to be unmanageable. Petitioner attempted once again to employ an individual to collect rents, but this attempt failed. After being notified of his delinquency in mortgage payments, petitioner *90 began to pay Mastro from his own funds rather than money collected from the rental of the apartment building. He also spent many weekends attempting to repair the building, a task he found nearly impossible due to extensive vandalism. The building continued to deteriorate and, consequently, many tenants refused to pay that on the damaged building. In early 1977, petitioner decided to stop making mortgage payments and to allow Mastro to repossess the building. Mastro commenced an action in the Superior Court of King County, Washington, to collect on the promissory note and to foreclose on the deed of trust. When payments became delinquent, Mastro began to telephone petitioners, often late at night, so frequently that petitioners sought and obtained on March 23, 1977, a temporary restraining order forbidding Mastro to contact petitioners. Petitioners also counterclaimed in the foreclosure suit, alleging injury to petitioner's health, as well as harassment and misrepresentation as to the building. Pending the foreclosure proceeding, other buyers expressed interest in the building, and negotiations for the sale of the apartment building took place among petitioners, the Mastros, *91 the Gamels, James J. Boyd and Earnell M. Boyd, N. Robert Nakao and Eiko P. A. Nakao, and Liem E. Tuai and Winnie J. Tuai. Petitioners refused to sign an agreement drafted among these parties because it lacked a provision releasing them from any future liability; without such a clause, if the new purchasers failed to make the requisite payments, petitioners would be liable for the payments during the years remaining on the promissory note and deed of trust. On May 19, 1977, an agreement was entered into among petitioners, the Mastros, the Gamels, and the Boyds. Under this agreement, petitioners conveyed the apartment building to the Boyds in consideration for the Boyds' assumption of the remaining liability on the promissory note and deed of trust. Petitioners agreed to pay Gamel and Mastro the sum of $ 17,200 for installment payments in arrears plus $ 4,547.64 in tax reserve payments. In addition to these delinquent payments, petitioners also agreed to pay Gamel and Mastro $ 25,000 to be released from any personal liability on the original deed of trust and promissory note. In addition to the release clause in the agreement, a separate release document was executed whereby Gamel *92 and Mastro again agreed to look for payment on the promissory note and deed of trust from only the Boyds or the building. Gamel and Mastro also agreed to dismiss their foreclosure action in the Superior Court while petitioners agreed to dismiss their counterclaims. Petitioners paid $ 1,380 to an attorney to represent them in the foreclosure suit and the negotiation of the settlement agreement pursuant to which the building was conveyed to the Boyds. Petitioners deducted the $ 25,000 payment as a liability release expense incurred in the operation of the apartment building. They also deducted the $ 1,380 payment to the attorney as legal fees incurred in the apartment rental business. In the notice of deficiency, respondent disallowed these deductions and, instead, applied the payments to reduce petitioners' capital gain by $ 13,190. OPINION Petitioners contend that they are entitled to deductions for the $ 25,000 payment to Mastro and the $ 1,380 payment of legal fees under section 162(a)[3] as ordinary and necessary business expenses incurred in operating the apartment building. Alternatively, they contend that these items are deductible under section 165(a)[4] as losses *93 incurred in the apartment building venture. On one of these grounds petitioners would have us hold that they are entitled to current deductions for the full amount of their payments. Release of Obligation on Promissory Note
We agree with respondent that petitioners' liability to make this disputed payment had its origin in a transaction involving the acquisition and disposition of the apartment building, a capital asset. Amounts expended in the acquisition or disposition of a capital asset are nondeductible *94 and must be added to the asset's basis or offset against its selling price. Woodward v. Commissioner, 397 U.S. 572, 578 (1970); Spangler v. Commissioner, 323 F.2d 913, 916 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; see Boagni v. Commissioner, 59 T.C. 708, 712 (1973). [5] Therefore, the $ 25,000 payment for release from liability on the note is not deductible under sections 162(a) or 165(a) but is a capital expenditure. Anchor Coupling v. United States, 427 F.2d 429, 433-434 (7th Cir. 1970); DeMink v. United States, 448 F.2d 867, 867, (9th Cir. 1971); Eisler v. Commissioner, 59 T.C. 634, 639 (1973). *95 We think it clear that the $ 25,000 was paid to settle petitioner's liability on the note given on his investment to the mortgage property. If, however, the payment can be considered unrelated to his investment in the apartment building, there is no foundation on which to predicate a deductible expense. If the payment was not related to that investment, petitioners merely settled their personal nonbusiness, noncapital liability on the promissory note by a $ 25,000 payment, and a deduction is not allowable for a personal expense. See Diamond v. Commissioner, 43 B.T.A. 809, 812 (1941). Petitioners further maintain that the payment was a deductible business expenses under section 162(a) because it was made for the purpose of protecting a separate ongoing business, petitioner's tractor business. In advancing this argument, petitioners rely on a discarded test. [6] Petitioners' "primary purpose" is irrelevant in determining the nature of the payment. The "origin and character of the claim * * *, rather than its potential consequences on the business operations of a taxpayer" *96 controls, Anchor Coupling, supra at 433; the instant claim's origin is a capital transaction. [7]
Petitioners contend that the payment is a noncapital expenditure *97 made to obtain a release from contingent liability in the nature of a guaranty. Such payments, they argue, have been held to be deductible from ordinary income, citing Commissioner v. Condit, 333 F.2d 585 (10th Cir. 1964) and Commissioner v. Shea, 327 F.2d 1002 (5th Cir. 1964), affg. 36 T.C. 577 (1961); but see and compare Putnam v. Commissioner, 352 U.S. 82 (1956). Petitioners argue that they would be required to pay the promissory note only if the purchasers failed to discharge their obligation on the assumed mortgage and, therefore, they occupy a position analogous to that of a guarantor. The payment, they urge, was not an integral part of the sale but was rather a separate payment made to terminate their status as guarantors. On this theory, they argue that the $ 25,000 payment reflects a loss under section 165(a). We agree with respondent that petitioners were not guarantors. Although it is true that, absent the release, petitioners night have been called upon to make payments if the purchasers had failed to meet their obligations, petitioners paid the $ 25,000 to terminate their obligations arising from their *98 own liability on a promissory note which they had signed in a capital transaction. Thus, they were not guarantors in any sense of the word. Petitioners further contend that had the $ 25,000 been paid some time after the sale, it would not have been in connection with the foreclosure litigation and would have constituted a payment in discharge of a guaranty. Petitioners' contention is erroneous. Whenever paid, the payment required to discharge the note would be made to terminate a claim of potential liability arising from petitioners' promissory note secured by a deed of trust on the apartment building. [8]
Legal Fees
It has been stipulated that $ 1,380 was paid to an attorney with regard to the foreclosure suit and for his review of the agreement. Because the suit and the agreement involved the disposition of a capital asset, they were capital transactions, and the accompanying legal fees must be capitalized. Petitioners argue, however, *99 that a more precise assessment must be made. Although the suit started as a foreclosure action, they state, its scope expanded to include a request for the appointment of a receiver and counterclaims alleging harassment, injury to health, and misrepresentation as to the building's condition These, petitioners maintain, fall under the rubric of ordinary and necessary expenses. [9]
Petitioners correctly state that is appropriate cases, allocations may be made between deductible expenses and capital ones involved in the same litigation or payment. Boagni v. Commissioner, supra; Eisler v. Commissioner, supra. In both of these cases, however, allocation was effected between two quite distinct claims, both with a business or capital origin. [10] Petitioners fail to distinguish between the allegedly deductible claims and the nondeductible claims, and provide no evidence which would allow us to allocate. [11] Although, as we have held, the foreclosure suit involved a capital transaction, the injury to *100 health and personal harassment claims appear to have been of a personal rather than business or capital in nature. Moreover, as petitioners bear the burden of proving respondent's over, as petitioners bear the burden of proving respondent's error in determining the deficiencies, Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure, we hold that petitioners have not met their burden. Respondent's determination will be sustained. *101 Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. The name "Mastro" appears in petitioners' briefs and the stipulation of facts as "Maestro," while respondent's brief and the various agreements refer to "Mastro."↩
3. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * ↩
4. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.↩
5. The fact that the asset involved here is a sec. 1231 asset rather than a capital asset per se does not serve to exclude the building from treatment under the origin-of-the-claim test. "Conceptually, [sec. 1231] assets used in the trade or business clearly seem to constitute capital assets in that by definition, they are used for the further production of goods and services." J. Mertens, Law of Federal Income Taxation, Code Commentary to ch. 1, subch. P, sec. 1231, at 45 (1979). The root transaction here involves the acquisition and disposition of an income producing asset; whether the asset is termed capital or sec. 1231 is irrelevant for purposes of assessing the capital or noncapital nature of the transaction.↩
6. Consideration of the "primary purpose" for a payment was the prevailing test before it was rejected in United States v. Gilmore, 372 U.S. 39 (1963); United States v. Hilton Hotels, 397 U.S. 580 (1970); Woodward v. Commissioner, 397 U.S. 572 (1970); and Anchor Coupling v. United States, 427 F.2d 429↩ (7th Cir. 1970). 7. This origin distinguishes the present case from Poole v. Commissioner, a Memorandum Opinion of this Court dated Mar. 14, 1942, which petitioners cite. In Poole, decided before Putnam v. Commissioner, 352 U.S. 82 (1956), a loss was permitted for a payment in release of a guaranty. This release was obtained, however, for what was undisputedly a true guaranty, taken on property purchased nearly 2 years earlier. The taxpayer had no personal liability on the property at the time of purchase. Thus, the release in Poole↩ neither originated in nor derived its character from a capital transaction.
8. Under the Arrowsmith doctrine, Arrowsmith v. Commissioner, 344 U.S. 6↩ (1952), a court can take a backward look at transactions in prior taxable years in order to characterize a later related payment.
9. Even if an allocation were to be made, it is unclear why expenses related to an injury to personal health would be a business expenses.↩
10. In Boagni v. Commissioner, 59 T.C. 708 (1973), allocation was made between two separate and distinct suits, one a declaratory judgment suit, the other a concursus action, for which two separate opinions were entered in trial and appellate courts. In Eisler v. Commissioner, 59 T.C. 634↩ (1973), the two claims were also discrete, one relating to a claim by an employer to re-acquire employee's stock, the other to a threatened negligence action by employer against employee. 11. As an aid in allocation, petitioners include a copy of the lawyer's account sheets. The explanation of charges in these sheets, however, does not provide a convincing basis for allocation since the charges combine the purportedly distinct claims; for example, preparation of the temporary restraining order is combined with "Conferences" and preparation of an answer, affirmative defenses and counterclaim. Even if we were to find the temporary restraining order costs to be business costs, a finding by no means certain, we would have no guidance in dividing the charge.↩