JAMES R. FITTS AND PAULA A. FITTS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fitts v. Commissioner
Docket No. 747-91
United States Tax Court
T.C. Memo 1994-52; 1994 Tax Ct. Memo LEXIS 51; 67 T.C.M. (CCH) 2136; February 9, 1994, Filed *51 Decision will be entered under Rule 155. James R. Fitts and Paula A. Fitts, pro sese. For respondent: Douglas S. Polsky. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined a deficiency of $ 40,725 in petitioners' Federal income tax for 1986. After concessions, the sole issue to be decided is whether any part of $ 56,818, which petitioner received in settlement of his claims against Plumbmaster, Inc., is excluded from taxable income under section 104(a)(2). Respondent concedes that an additional $ 50,000 that petitioners received is excluded. We hold that 14,204.50, in addition to the $ 50,000 conceded by respondent, is excluded from income. References to petitioner in the singular are to James R. Fitts. Section references are to the Internal Revenue Code in effect during the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioners
Petitioners are husband and wife who resided in Kansas City, Missouri, when they filed their petition in this case. 2. Triangle Brass & Specialties, Inc.
Petitioner, Robert *52 Hodes (Hodes), and James E. Caton (Caton) established Triangle Brass & Specialties, Inc. (Triangle), in 1979 in Missouri. Before March 15, 1983, petitioner owned 3,708 shares (14.83 percent) of Triangle common stock. Triangle's store was in Lenexa, Kansas. Triangle established a line of credit at Boatmen's First National Bank of Kansas City (Boatmen's) secured by inventory and accounts receivable. Petitioners, Robert and Joy Ann Hodes, and Caton personally guaranteed Triangle's indebtedness to Boatmen's. 3. Sale of Triangle Stock to Plumbmaster, Inc.
On March 15, 1983, petitioner, Hodes, and Caton sold their Triangle stock to Plumbmaster, Inc. (Plumbmaster), a subsidiary of NCH Corporation. The following events occurred on March 15, 1983, as part of the sale: (1) Boatmen's refinanced Triangle's debt in part by Boatmen's releasing Triangle from its indebtedness to Boatmen's; (2) petitioners, Mr. and Mrs. Hodes, and Caton signed a promissory note to Boatmen's for $ 134,729.16 in exchange for Boatmen's release of Triangle's debt; (3) Triangle agreed to pay petitioner, Hodes, and Caton $ 134,729.16 in bonuses over a 3-year period in amounts that varied according to Triangle *53 profits; (4) petitioner signed an employment agreement with Triangle which included a covenant not to compete for 18 months after the termination of petitioner's employment; and (5) Triangle employed petitioner as its business manager. Thus, under the agreement, petitioner, Hodes, and Caton were to repay Boatmen's debt from bonuses that Plumbmaster was to pay them. 4. Termination of Petitioner's Services
In December 1985, Plumbmaster asked petitioner to terminate his position as manager of Triangle and to take a regional or district sales manager position. Petitioner declined. Petitioner's employment with Triangle ended in December 1985. Triangle paid petitioner $ 16,668.40, his total salary for the first 4 months of 1986. Plumbmaster also terminated Hodes and Caton. 5. Petitioners' Claims
Petitioner considered Plumbmaster's actions to be improper, and retained attorney Joseph H. Moore (Moore) to represent him against Plumbmaster. Moore wrote to Plumbmaster on March 31, 1986, to ask whether petitioner's salary would be paid during the 18-month period during which petitioner agreed not to compete. Moore threatened suit to rescind the March 15, 1983, employment *54 agreement between Triangle and petitioner. Early in 1986, petitioner, Caton, and Hodes retained attorney R. Pete Smith (Smith) to represent them in their claims against Plumbmaster and NCH. On April 2, 1986, Smith sent a letter to Lester A. Levy, Triangle's president, outlining their common claims against Plumbmaster and NCH. On May 28, 1986, Smith sent a detailed 15-page letter and exhibits to counsel for Plumbmaster and NCH stating his clients' individual and common claims. Petitioners, Mr. and Mrs. Hodes, and Caton made common claims against Plumbmaster based on fraudulent misrepresentation in inducing the 1983 sale of Triangle, civil conspiracy, intentional interference with contractual relations, interference with prospective employment, and breach of obligation of good faith. They sought damages for the common claims, including the benefit of their bargain as a measure of their damages, punitive damages, attorney's fees, and litigation costs. They sought $ 205,000 in damages for their common claims. They intended to use those proceeds to repay the debt to Boatmen's. Smith also made individual claims for petitioner in the 15-page letter. Smith claimed that Plumbmaster *55 owed petitioner amounts for employment bonuses for 1985 and 1986 and for early termination. Smith asserted in the letter that Plumbmaster interfered with petitioner's prospective employment by blacklisting him in violation of section 44-117 of the Kansas Statutes Annotated (1986) (blacklisting statute). Petitioner sought at least $ 147,660 for his individual claims, including: (1) Six thousand and sixty dollars in wages; (2) 18 months of salary following employment termination; (3) a total of $ 90,000 in bonuses for 1985 and 1986; (4) $ 1,600 due under the April 24, 1984, employment agreement for car allowance and gas bill, and $ 50,000 for salary; and (5) release of the agreement not to compete. Petitioner filed a $ 6,060 claim against Triangle with the Kansas Department of Human Resources Division of Employment on May 13, 1986, for wages earned but unpaid under Kansas Wage Payment Law, sections 44-313 through 44-327 of the Kansas Statutes Annotated (1986). 6. Settlement
Petitioner, Hodes, Caton, and Smith met with Ed Schmitt (Schmitt) and Larry Margolies (Margolies), counsel for Plumbmaster and NCH, on June 20, 1986, at the offices of Dietrich, Davis, Dicus, Rowlands, *56 Schmitt & Gorman to negotiate a settlement. Schmitt and Margolies were in one office while petitioner, Caton, and Hodes were in a separate conference room. In addition to the written claims described above, at the meeting Smith claimed that Plumbmaster and NCH caused petitioners emotional harm, hampered petitioner's ability to obtain employment in his field, and caused potential bankruptcy. Smith went back and forth between the parties in an effort to settle the dispute before a lawsuit was filed. Petitioner told Smith that if petitioner didn't get a certain amount, he would sue Plumbmaster. After numerous offers from Plumbmaster, Plumbmaster made an offer which Smith recommended that petitioner, Caton, and Hodes accept. Petitioner accepted the offer after Smith agreed to reduce his attorney's fees, and petitioner, Hodes, Caton, and Smith agreed how to split the proceeds. The parties agreed to settle all potential outstanding claims by Plumbmaster paying a lump sum of $ 275,000 in 1986, releasing the restrictive covenants, and providing letters of recommendation for petitioner, Hodes, and Caton, in exchange for the release of all liability by petitioners, Mr. and Mrs. Hodes, *57 and Caton. Smith did not tell the Plumbmaster and NCH representatives how to allocate the money. Petitioner, Hodes, and Caton divided the $ 275,000 payment as follows: (1) One hundred fifty thousand dollars to pay the Boatmen's debt; (2) $ 56,818 to petitioner, $ 34,090 to Caton, and none to Mr. and Mrs. Hodes for their individual claims; and (3) $ 34,090 for Smith's attorney's fees. The settlement and release agreement included the following: WHEREAS, disputes have arisen between Plumbmaster, including its parent NCH Corporation, and Hodes, Fitts and Caton concerning Plumbmaster's purchase and management of Triangle, concerning payments allegedly due Hodes, Fitts and Caton from Triangle in connection with Plumbmaster's purchase of Triangle and its employment of Hodes, Fitts and Caton and concerning enforcement of their post-employment covenants, and WHEREAS, Plumbmaster individually and on behalf of NCH Corporation and Hodes, Fitts and Caton have agreed mutually to compromise and settle all of their disputes and claims of whatsoever kind and nature which they now have or might have against each other. NOW THEREFORE, in consideration of the monies herein paid and promises *58 herein contained, it is agreed as follows: 1. That at execution hereof Plumbmaster will pay to Hodes, Fitts and Caton and their attorneys, R. Pete Smith and McDowell, Rice and Smith, the total lump sum of Two Hundred Seventy-five Thousand Dollars ($ 275,000.00) cash to be divided and distributed between them as they may agree. 2. That Plumbmaster, on behalf of itself, its parent NCH Corporation, their respective affiliates, subsidiaries and divisions, including Triangle and its statutory trustees and Hodes, Fitts and Caton, individually and in all other capacities MUTUALLY AND FOREVER RELEASE AND DISCHARGE each other, individually, severally and jointly (including without limiting the generality hereof Plumbmaster, Triangle and its statutory trustees, NCH Corporation, their respective affiliates, subsidiaries, successors, assigns, officers and agents and Hodes, Fitts and Caton and their respective heirs, representatives and assigns and all persons, firms and/or corporations who are or might be liable) from all claims, demands, rights of action and causes of action of every kind and character which any or all of the parties herein named may or might have against any, each or all *59 of the others severally, jointly or collectively whatsoever for damages (actual or punitive), loss, cost or expense, including attorneys' fees, known or unknown, developed or undeveloped, resulting or which might hereafter result from or in connection with the above described purchase and management of Triangle by Plumbmaster including said promissory note by Hodes, Fitts and Caton to Bank and the employment rights and obligations of Hodes, Fitts and Caton with Triangle and Plumbmaster, including their post-employment covenants and any and all other matters, whether or not herein described.
NCH viewed the dispute as a business deal with petitioners, Mr. and Mrs. Hodes, and Caton that turned out badly and was not getting any better. NCH paid the money to obtain the release of all possible claims by petitioners, Mr. and Mrs. Hodes, and Caton. NCH reported the payment as nonemployee compensation in three equal amounts of $ 91,666.66 (one-third of $ 275,000) on Forms 1099-MISC issued to petitioner, Hodes, and Caton. The company deducted the $ 275,000 as an expense in the "Other Deduction" category on its Form 1120. 7. Petitioners' Treatment of the Payment
Petitioners attached *60 the Form 1099-MISC to their return with a statement that the amounts reported on it were not taxable. OPINION 1. Background
Respondent determined that petitioners' taxable income should be increased by $ 106,818, the amount petitioners received in the settlement. Before trial, respondent conceded that $ 50,000 of petitioners' $ 106,818 settlement payment is excluded as petitioners' share of the settlement proceeds used to repay a bank debt. The sole issue for decision is to what extent, if any, the remaining $ 56,818 of petitioners' settlement payment is excluded from gross income under section 104(a)(2). Petitioners have the burden of proof. Rule 142(a). Gross income includes all income from whatever source derived. Sec. 61(a). However, gross income does not include "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness". Sec. 104(a)(2). The term "damages received (whether by suit or agreement)" means an amount received through prosecution of a legal suit or action based upon tort or tort-type rights, or through a settlement agreement in lieu of such prosecution. *61 United States v. Burke, 504 U.S.    , 112 S. Ct. 1867, 1870 (1992); Horton v. Commissioner, 100 T.C. 93, 97 (1993); Threlkeld v. Commissioner, 87 T.C. 1294, 1305 (1986), affd. 848 F.2d 81 (6th Cir. 1988); sec. 1.104-1(c), Income Tax Regs. If a payment was made pursuant to a settlement agreement, the taxpayer must show the nature of the claim which was the basis for settlement. Downey v. Commissioner, 97 T.C. 150, 161 (1991); Metzger v. Commissioner, 88 T.C. 834, 847 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); Threlkeld v. Commissioner, 87 T.C. at 1297. In United States v. Burke, supra, the Supreme Court stated that, Neither the text nor the legislative history of § 104(a)(2) offers any explanation of the term "personal injuries." Since 1960, IRS regulations formally have linked identification of a personal injury for purposes of § 104(a)(2) to traditional tort principles * * *62 * [Fn. ref. omitted.]
United States v. Burke, supra at    , 112 S. Ct. at 1870. Thus, if the legal basis for a taxpayer's claim redresses a tort-like personal injury, damages received for that claim are excludable. United States v. Burke, supra at    , 112 S. Ct. at 1874. 2. Whether Petitioners' Claim Is Based On A Tort-Like Personal Injury
Generally, a tort is a civil wrong, other than breach of contract, for which a court will provide damages. Prosser & Keeton on Torts, sec. 1, at 2 (5th ed. 1984). [1] Contract obligations arise from promises to do or not to do something. Id. at 656. Tort obligations are, in general, obligations to avoid injury to others independent of contractual obligations. Id. at 655. A claimant may be able to bring an action in both tort and contract for the same loss. Id.
*63 The phrase "on account of personal injuries" includes both nonphysical and physical injuries. United States v. Burke, supra at    , 112 S. Ct. at 1871-1872 n.6; Threlkeld v. Commissioner, 848 F.2d 81, 84 (6th Cir. 1988), affg. 87 T.C. 1294, 1308 (1986); Bent v. Commissioner, 87 T.C. 236, 244 (1986), affd. 835 F.2d 67, 69-71 (3d Cir. 1987). Section 104(a)(2) has been held to apply to several types of nonphysical personal injury, such as emotional distress, Downey v. Commissioner, supra at 164; mental or psychic suffering, Bent v. Commissioner, 835 F.2d at 71; indignity, humiliation, inconvenience, pain and distress of mind, prevention from attending usual pursuits, injury to personal, professional, and credit reputation, Threlkeld v. Commissioner, 848 F.2d at 81-82; alienation of affection, defamation of personal character, and surrender of child custody rights, Roemer v. Commissioner, 716 F.2d 693, 697 (9th Cir. 1983), *64 revg. 79 T.C. 398 (1982). Petitioners received compensatory damages in part for being fraudulently induced by misrepresentation to sell their business. [2]
The settlement agreement does not state whether Kansas or Missouri law applies. The contract in which petitioners sold the stock of Triangle to Plumbmaster provides that Missouri law will govern disputes under that contract. Petitioners' legal argument refers to Kansas statutory and common law. Respondent's brief does not challenge that the settlement is governed by Kansas law. In any event, the parties have not cited any relevant difference in the law of these states. In Hill v. United States, 733 F. Supp. 88, 89 (D. Kan. 1990), the court held that damages paid in response to a claim of misrepresentation under Kansas law were excludable under section 104(a)(2). The *65 court said, What constitutes "personal injuries," within the meaning of section 104(a)(2) is a question of fact. Threlkeld v. Commissioner, 87 T.C. 1294 (1986). While state law may be relevant in making this determination, it is not dispositive, and compensation received for both physical and nonphysical injuries may be subject to exclusion. Id.
Under Kansas law, misrepresentation is an actionable tort. Tetuan v. A.H. Robins Co., 241 Kan. 441, 738 P.2d 1210 (1987); Johnson v. Geer Real Estate, 239 Kan 324, 720 P.2d 660 (1986). * * *
Id.
Misrepresentation is an actionable tort in Missouri. Sullenger v. Cooke Sales & Service Co., 646 S.W. 2d 85, 90 (Mo. 1983) (en banc); Huttegger v. Davis, 599 S.W.2d 506, 511 (Mo. 1980) (en banc). In their claim against Plumbmaster, petitioners alleged that Plumbmaster fraudulently misrepresented facts to induce petitioners to sell Triangle. Petitioners' counsel, Smith, claimed that Plumbmaster's conduct caused petitioner to lose his job, *66 suffer emotional harm, be unable to obtain employment, and be pushed with his wife to the brink of bankruptcy. Petitioner's wife made claims against Plumbmaster and was a party to the settlement agreement even though she did not have any business relationship with Plumbmaster. Smith asserted claims for petitioners based on misrepresentation, emotional distress, and breach of contract. The settlement agreement included a release of all claims between the parties. We conclude that Plumbmaster's settlement payments were made on account of petitioners' claims of breach of contract and also on account of their claims of misrepresentation and emotional distress. Thus, we conclude that part of the settlement payment was excludable and part was not excludable under section 104(a)(2). If settlement results from claims based on both personal injury and claims not based on personal injury, we may allocate amounts to each claim. Stocks v. Commissioner, 98 T.C. 1, 14 (1992); Eisler v. Commissioner, 59 T.C. 634, 640 (1973). Petitioners have provided little to guide us in making the allocation, perhaps because of the broadly inclusive *67 nature of the statement of the claims in communications between their counsel and Plumbmaster. However, because petitioners bear the burden of proof and in the absence of any persuasive analysis otherwise from petitioners, we conclude that one-fourth of the amount which remains at issue, or $ 14,204.50, is allocable to claims for damages paid on account of personal injury for purposes of section 104(a)(2). This case is unlike Byrne v. Commissioner, 883 F.2d 211 (3d Cir. 1989), revg. 90 T.C. 1000 (1988), where the court found that most of the settlement proceeds were on account of personal injuries. 3. Evidentiary Issue
Petitioners argue that a proposed settlement of this case, which was not accepted, indicates that at least a part of the settlement is excludable. Respondent contends that evidence of a proposed settlement is not admissible under rule 408 of the Federal Rules of Evidence to prove liability for or invalidity of the claim or its amount. Rule 408 of the Federal Rules of Evidence provides: Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to *68 accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
We agree with respondent and do not consider any proposed settlement of this case to decide it. To reflect concessions and the foregoing, Decision will be entered under Rule 155. Footnotes
1. Even though tort law is now recognized as a proper subject, a really satisfactory definition of a tort is yet to be found. * * * [Fn. ref. omitted.] * * * In the first place, tort is a field which pervades the entire law, and is so interlocked at every point with property, contract and other accepted classifications that, as the student of law soon discovers, the categories are quite arbitrary. * * *↩
Prosser & Keeton on Torts, sec. 1, at 1-3 (5th ed. 1984).
2. Fraud and deceit usually involve injury to property rather than to the person. 37 Am. Jur. 2d 389 Fraud and Deceit, sec. 292 (1968).↩